[No. B230342. Second Dist., Div. Three. June 22, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
MARGARITO A. IBOA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts I.(A) and (C), IV., V., VI., and VII.

**COUNSEL**

Carla Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ALDRICH, J.—**

## INTRODUCTION

Defendant and appellant Margarito A. Iboa told firefighters and deputies trying to put out a fire in his backyard to, among other things, "get the fuck"

off his property. He combined his belligerent words with aggressive conduct, albeit stopping short of threatening to "kill" the officers and of physical violence. Iboa was charged and convicted, under Penal Code section 69,[1] of seven counts of deterring or preventing, by means of any threat or violence, an executive officer from performing a duty imposed by law.

Iboa contends on appeal that his convictions on those counts must be reversed because the First Amendment protected his speech and because the jury was not instructed his threat must have been "a serious expression of intention to inflict bodily harm." In the published portion of this opinion, we find that where, as here, there is sufficient evidence a defendant combined threatening language with threatening physical behavior, he may be convicted, under section 69, of threatening unlawful violence without running afoul of the First Amendment. We also conclude that the trial court did not err by failing to instruct the jury that a threat under section 69 must be "a serious expression of intention to inflict bodily harm," because that is not an element of the crime.

Although we conclude that there is no ground to reverse Iboa's convictions under section 69, we find, in the unpublished portion of this opinion, that there is insufficient evidence to support the jury's true findings on the gang allegations as to five of the seven counts. We also find that Iboa's convictions on three counts of felony child endangerment must be reduced to misdemeanors. We reject the remaining contentions and reverse and remand this matter for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

I. *Factual background.*

    (A) *December 28, 2009: Iboa refuses to submit to a lawful detention (count 12).*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[1] All further undesignated statutory references are to the Penal Code.

[*]See footnote, *ante*, page 111.

(B)   *January 26, 2010: Iboa attempts by threats to deter executive officers from performing their duties (counts 1–7).*

On January 26, 2010, at 2:00 a.m., about 12 firefighters (including Michael Peterson, Joseph Carvalho, Jason Swan, Christopher Brown, and Fire Captain Jim De'Evelyn) went to Iboa's house after receiving reports of a fire. A 10- to 12-foot pile of debris was on fire in Iboa's backyard, and 10-foot flames could be seen from the street. Asleep, Iboa was off to the side of the fire. Firefighter Carvalho woke Iboa, who grabbed a hose to help put out the fire.

When Fire Captain De'Evelyn tried to talk to Iboa about the fire, an argument erupted. Concerned that Iboa was going to assault the captain, because Iboa "was kind of puffed-chest" and "cussing," firefighter Carvalho stepped between De'Evelyn and Iboa. Firefighter Brown also thought that Iboa approached the captain aggressively, with "just maybe kind of a little physical threat, kind of a little body force." Iboa turned to go back to the house, and Carvalho, thinking that Iboa was getting a gun or knife, told the other firefighters to leave, even though they were not done putting out the fire. When Iboa ran past firefighter Swan, he heard Iboa say, " 'I'll take care of you guys' " or " 'You'll see what happens.' " Firefighter Brown thought Iboa said something like, " 'I'm going to show you' " or " 'We'll see about that.' "

Iboa came out of the backyard and threw out the firehose. He yelled at the firefighters to "get the fuck off his property" and asked "who the fuck [they] thought [they] were." He said they did not know "who the fuck" he was, and he would "show [them] who" he was. The fire chief instructed the firefighters to wait for sheriffs to arrive.

Los Angeles County Deputy Sheriffs Ryan Valento and Gabriel Frias soon arrived at the house, where the fire was still burning. Deputy Frias asked Iboa to talk to him, but Iboa said, " 'Fuck you guys. You need a warrant. I can burn whatever I want.' " Iboa lifted his shirt, exposing his Mid Town Criminals (MTC) gang tattoos, and yelled that they could not come in without a warrant, that " 'You can't fuck with me. I'm from fuckin' M-T-C,' " which was tattooed on his stomach. Deputy Valento thought that Iboa, whose fists were clenched, wanted to fight. Yelling, Iboa, while lifting his shirt and acting wild, walked back and forth towards the deputies until he was eight to 10 feet from them. Deputy Valento judged it unsafe to go onto Iboa's property to take care of the fire until more deputies arrived.

When more deputies arrived, they jumped over the fence, and Iboa ran into the house. With their guns out, the deputies told the firefighters to put out the fire, which they quickly did. Iboa did not come back outside.

(C) *January 27, 2010: The search of Iboa's home (counts 8–10).*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(D) *Gang evidence.*

Detective Richard Cartmill at the Lancaster sheriff's station was assigned to the gang unit in Antelope Valley. He was familiar with the MTC gang in Antelope Valley and had testified approximately 10 times as an expert on the gang, which had about 120 documented members. MTC engaged "in crimes such as assaults, up to and including attempted murder, weapons possession, possession for sales of drugs, vandalism, [and] robbery." It was known for selling methamphetamine.

Iboa had been MTC's leader for close to a decade. His home on Gadsen was a well-known MTC house. He had "MTC" tattooed on his stomach, "Mid Town Criminals" tattooed on his neck, a teardrop tattoo on his face, and "Heffe de Heffe" on his arm.

According to Detective Cartmill, a gang member displays and references his gang tattoos to law enforcement to intimidate law enforcement and the general public and to enhance the gang's reputation.

II. *Procedural background.*

On October 22, 2010, a jury found Iboa guilty of counts 1 to 7, attempting by threat or violence to deter an executive officer from performing his or her duty (§ 69);[2] counts 8 to 10, felony child endangerment (§ 273a, subd. (a)); count 11, possession of methamphetamine for sale (Health & Saf. Code, § 11378); and count 12, resisting, obstructing or delaying a peace officer (§ 148, subd. (a)(1)). As to counts 1 to 7 and 11, the jury found true gang allegations under section 186.22, subdivision (b)(1)(A). As to count 12, the jury found true a gang allegation under section 186.22, subdivision (d).

On January 18, 2011, the trial court sentenced Iboa to the midterm of two years on count 1 plus three years on the gang enhancement, to one year four months on count 8, to one year eight months on count 11, and to eight

---

[*]See footnote, *ante*, page 111.

[2] Counts 1 to 5 concerned firefighter Peterson, paramedic Swan, fire engineer Brown, Captain De'Evelyn, and paramedic Carvalho; and counts 6 and 7 concerned Deputies Frias and Valento.

months on count 12, for a total of eight years eight months in prison. The court imposed concurrent sentences on the remaining counts.[3]

## DISCUSSION

III.   *Counts 1 to 7, preventing an executive officer from performing an official duty under section 69*

(A)   *Sufficiency of the evidence.*

Iboa contends that his convictions under section 69 violate his First Amendment right to free speech because there was insufficient evidence anything he said was a "serious expression of an intention to commit an act which would result in bodily harm" to the firefighters and deputies. We disagree.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618]; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

█     Section 69 provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing

---

[3] The court imposed concurrent two-year sentences on counts 2 through 7, plus three years based on the gang enhancement on each of the counts. The court imposed concurrent four-year sentences on counts 9 and 10.

any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty" shall be punished by a fine or imprisonment. (See *In re Manuel G.* (1997) 16 Cal.4th 805, 814 [66 Cal.Rptr.2d 701, 941 P.2d 880].) The section prohibits two distinct types of activity—"threats and violent conduct—when *either* activity constitutes an attempt 'to deter or prevent an executive officer from performing any duty imposed upon such officer by law.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1061–1062 [64 Cal.Rptr.2d 594, 938 P.2d 388] (*Hines*); see *In re Manuel G.*, at p. 814.)

Where, as here, physical violence does not accompany the threat, we must be mindful of the risk of punishing First Amendment speech. The First Amendment protects expression that engages, in some fashion, public dialogue. (*In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365].) But where speech strays from "the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression." (*In re M.S.*, at p. 710.) The state may thus punish threats falling outside the purview of the First Amendment, even if the threat is pure speech. (*In re M.S.*, at p. 710; *Virginia v. Black* (2003) 538 U.S. 343, 359 [155 L.Ed.2d 535, 123 S.Ct. 1536] [a " 'true threat' " encompasses "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence" to an individual or group].) To avoid the risk of punishing protected First Amendment speech, the "threat" section 69 refers to is therefore a threat of unlawful violence in an attempt to deter the officer. (*In re Manuel G., supra*, 16 Cal.4th at p. 815 ["The central requirement of the first type of offense under section 69 is an attempt to deter an executive officer from performing his or her duties imposed by law; unlawful violence, or a threat of unlawful violence, is merely the means by which the attempt is made."]; *People v. Superior Court (Anderson)* (1984) 151 Cal.App.3d 893, 895–898 [199 Cal.Rptr. 150] (*Anderson*).)

█ Although section 69 prohibits a threat of "unlawful violence," Iboa argues that section 69 instead requires a showing his threat was a " 'serious expression of intention to inflict bodily harm.' " (*Hines, supra*, 15 Cal.4th at p. 1061.) Iboa bases this argument on *Hines*, which rejected a custodial defendant's argument that section 69 was unconstitutionally overbroad because he did not have the immediate ability to carry out his threat to kill prison guards. *Hines* said: " 'As long as the threat reasonably appears to be a serious expression of intention to inflict bodily harm [citation] and its circumstances are such that there is a reasonable tendency to produce in the victim a fear that the threat will be carried out' " (15 Cal.4th at p. 1061, quoting *In re M.S., supra*, 10 Cal.4th at p. 714), "the fact the threat may be contingent on some future event . . . does not cloak it in constitutional protection" (*In re M.S.*, at p. 714). *Hines* concerned constitutional challenges

to statutes proscribing threats and concluded that such a statute, like section 69, will not run afoul of the First Amendment because it lacks an immediacy element. (*Hines*, at p. 1061.) In other words, threats may be prohibited even when there is no immediate danger they will be carried out, and section 69 " 'is not unconstitutional for lacking a requirement of immediacy or immitence.' [Citation.]" (*Hines*, at p. 1061.)

*Hines*'s observation that the threat must be a serious expression of intention to inflict bodily harm was therefore made in the context of rejecting a constitutional challenge to section 69 on overbreadth grounds. This is apparent when the entire *Hines* quote is cited and not the truncated one Iboa uses; specifically, Iboa notes that *Hines* said the threat must reasonably appear to be a " 'serious expression of intention to inflict bodily harm.' " He ignores that the court went on to say that the threat's " 'circumstances are such that there is a reasonable tendency to produce in the victim a fear that the threat will be carried out . . . .' " (*Hines, supra*, 15 Cal.4th at p. 1061.) The omitted language confirms that the court was addressing only the constitutional argument and refuting the notion that the consequence threatened must be immediately forthcoming. The court did not discuss the elements of the crime under section 69 or otherwise suggest that a " 'serious expression of intention to inflict bodily harm' " is an element of the crime.

Rather, to sustain Iboa's conviction under section 69, there must be sufficient evidence he threatened unlawful violence. (*Anderson, supra*, 151 Cal.App.3d at pp. 895–898.) It is true that Iboa did not utter the word "kill" or directly and unambiguously threaten to inflict bodily harm on the firefighters or the deputies. (Cf. *In re Manuel G., supra*, 16 Cal.4th at p. 811 [" 'Me and my home boys are going to start killing you and your friends.' "; " 'Hey, you better be watching your back. And we're going to start knocking you guys off. You guys aren't so bad. I'm not afraid of dying. You guys are the ones that should be afraid of dying.' "]; see *id.* at p. 812 [" 'I'm tired of you guys fucking with us, and you better watch out, we're going to start knocking you guys off.' "]; *Hines, supra*, 15 Cal.4th at pp. 1060, 1059 [the defendant said Deputy Warren " 'would be sorry [he] ever saw' defendant"; he would throw bars of soap at Warren; " 'I am going to kill you. This is a threat. You're dead.' "; " 'Stop going through my stuff or I will kick you in the face.' "]; *Anderson*, at p. 893 [the defendant wrote a letter to the mayor threatening to kill her if she did not resign].) Although these cases involve an unequivocal threat to "kill" the executive officer, threats must be placed and understood in their context, otherwise the line between, for example, heated but protected political hyperbole and an unprotected threat of unlawful violence will not easily be drawn. (See, e.g., *Anderson*, at p. 896; *Watts v. United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399] [taken in the context of a political rally, a threat to shoot the president was political hyperbole]; *Beck v. City of Upland* (9th Cir. 2008) 527 F.3d 853, 858 [placed

in the context of a heated discussion over zoning violations, Beck's statement that the officer " '[did not] know who [he was] dealing with' " could not have been understood to threaten violence].)

Iboa's words were not mere "political hyperbole." They were threats of unlawful violence. Iboa swore at the firefighters to "get the fuck off his property," asked "who the fuck [they] thought [they] were," told them they did not know "who the fuck" he was, and he would "show [them] who" he was. Violently, he threw the firehose out of his backyard. Heatedly, he argued with Captain De'Evelyn, causing other firefighters to become concerned that Iboa, who "was kind of puffed-chest," cursing and aggressive, would assault the captain. Believing that violence was imminent, firefighter Carvalho stepped between Captain De'Evelyn and Iboa. Then, when Iboa started back to the house, firefighters heard Iboa say something to the effect of, " 'I'll take care of you guys' " or " 'You'll see what happens' " or " 'I'm going to show you' " or " 'We'll see about that.' " Believing that Iboa was getting a weapon, the firefighters left Iboa's property, even though the fire had not been completely extinguished.

When Deputies Valento and Frias arrived, Iboa continued to behave belligerently, saying, " 'Fuck you guys. You need a warrant. I can burn whatever I want.' " While such harsh words alone might not constitute a threat of unlawful violence,[4] Iboa then underscored his words with action: he lifted his shirt to expose gang tattoos. He told the deputies they could not " 'fuck' " with him because he was " 'from fuckin' M-T-C.' " During this time, Iboa's fists were clenched and he paced back and forth towards the deputies, causing the deputies to wait for backup before venturing onto Iboa's property.

█    Iboa's threatening statements, combined with his physical conduct of pacing, clenching his fists, showing off his gang tattoos, and aggressively approaching Captain De'Evelyn, constituted the type of threat of unlawful violence section 69 prohibits. His conduct gave context to his threatening speech, which was intended to and did deter the firefighters and deputies from performing their official duties.

(B)  *Instructional error.*

█    Based on his misreading of *Hines*, Iboa also contends that the trial court, sua sponte, should have instructed the jury that his threat had to be a

_____

[4] See *Houston v. Hill* (1987) 482 U.S. 451, 461 [96 L.Ed.2d 398, 107 S.Ct. 2502], quoting *Terminiello v. Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 69 S.Ct. 894] ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. 'Speech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.' ").

"serious expression of intention to inflict bodily harm."[5] A trial court must instruct the jury, sua sponte, on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Moye* (2009) 47 Cal.4th 537, 548 [98 Cal.Rptr.3d 113, 213 P.3d 652]; *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) But if "the original instructions are themselves full and complete . . . ," whether additional explanation is required "to satisfy the jury's request for information" is a matter left to the trial court's discretion. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213 [275 Cal.Rptr. 729, 800 P.2d 1159], superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682 [10 Cal.Rptr.3d 536, 85 P.3d 444].) When an instruction is potentially ambiguous or misleading, the instruction is not reversible error unless there is a reasonable likelihood that the jurors misunderstood or misapplied the pertinent instruction. (*Ibid.*; *People v. Avena* (1996) 13 Cal.4th 394, 416–417 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

As we have said, the full, not truncated, quote from *Hines* is the threat must reasonably appear to be a " 'serious expression of intention to inflict bodily harm' " *and* " 'its circumstances are such that there is a reasonable tendency to produce in the victim a fear that the threat will be carried out . . . .' " (*Hines, supra*, 15 Cal.4th at p. 1061.) Although Iboa argues that the jury should have been instructed with the first part of the quote, he gives no explanation why the second part of it should be ignored. To instruct the jury with either the partial or full quote would, in any event, potentially confuse the jury by suggesting a requirement that the victim in fact believed that the threat would be carried out. The victim, however, need not believe there is an immediate danger the threat will be carried out. (*Ibid.*) The trial court therefore properly did not instruct the jury with Iboa's proposed language from *Hines*.

The jury was instead properly instructed: "Every person who willfully [and unlawfully] attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon that officer by law, or who knowingly resists, by the use of force or violence, an executive officer in the performance of his or her duty, is guilty of a violation of Penal Code section 69, a crime. . . . [¶] . . . [¶] In order to prove this crime, each of the following elements must be proved: [¶] [1.] A person willfully [and unlawfully] attempted to deter or prevent an executive officer from performing . . . any duty imposed upon that officer by law; and [¶] [2.] The attempt was accomplished by means of any threat or violence." (CALJIC No. 7.50.)

---

[5] Iboa did not request a jury instruction, and therefore the issue arguably has been forfeited. We will nonetheless address the issue to preclude the ineffective assistance of counsel claim.

This informed the jury that the attempt to deter the executive officer from performing an official duty had to be accomplished by *"threat or violence."* This language strongly suggests that the threat must rise to a level of unlawful violence.[6] This is especially clear when considered in the context of the prosecutor's argument. The prosecutor told the jury: "It's important to understand that those [section] 69 charges are not assaults on executive officers. . . . [¶] It's the threatening, violent behavior that causes an executive officer not to be able to perform the duty . . . ." He also argued: "And violence, again, isn't contact. Violence is behavior. The threat is the behavior. 'I'm MTC, motherfucker. Get off my block.' [¶] That's the threat."

Defense counsel similarly argued that the jury had to decide whether Iboa's threats were threats of violence: "Violence and a threat can be verbal, threaten to shoot someone. I'm going to shoot you. I'm going to punch you. Those are obviously threats. [¶] Now, violence can also be interpreted based on the circumstances. You can look at someone's conduct and words and judge whether or not it's violent. [¶] For instance, if you say—if you're acting crazy, you're acting belligerent, you say, 'I'll show you. You point your hand out like a gun gesture.' Verbally you're not threatening them, but that could be interpreted as a threat. That makes sense. [¶] But when you say, 'Oh. I'll show you,' if you're just yelling, you know, acting crazy and belligerent, that doesn't rise to the level of violence. [¶] Yeah, he's acting stupid, he's being a jerk, but that isn't necessarily violence."

The prosecutor and defense counsel thus clearly conveyed to the jury that the "threat" section 69 prohibits is one of violence. There was no suggestion that a threat unrelated to unlawful violence would violate section 69.[7]

IV.–VII.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] Iboa does not argue that the jury should have been instructed that the threat must be one of "unlawful violence" (*In re Manuel G., supra,* 16 Cal.4th at pp. 814–815), and we do not address that issue.

[7] Iboa also argues that his counsel provided ineffective assistance, because he did not ask that CALJIC No. 7.50 be modified. (See generally *People v. Holt* (1997) 15 Cal.4th 619, 703 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Carter* (2003) 30 Cal.4th 1166, 1211 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].) Because we have found that the trial court had no sua sponte duty to instruct the jury that a violation of section 69 requires a showing of a serious expression of an intention to commit an act which would result in bodily harm, Iboa's ineffective assistance of counsel claim fails.

[*]See footnote, *ante,* page 111.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The judgments on counts 8, 9, and 10 for felony child endangerment are reduced to misdemeanor child endangerment. The true findings on the gang enhancement allegations in counts 1 through 5 and 12 are reversed. The matter is remanded for resentencing only.

Klein, P. J., and Croskey, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 10, 2012, S204434.